No. 22-15804

---

# In the United States Court of Appeals for the Ninth Circuit

---

HAROLD DAVIS,
*Plaintiff-Appellant*,

v.

PINTEREST, INC.,
*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of California
Case No. 19-cv-07650-HSG
Hon. Haywood S. Gilliam, Jr.

---

## ANSWERING BRIEF OF PINTEREST, INC.

---

David H. Kramer
Thomas R. Wakefield
Andrew Kramer
Qifan Huang
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304-1050
(650) 493-9300

Fred A. Rowley, Jr.
WILSON SONSINI GOODRICH & ROSATI
633 W. Fifth Street, Suite 1550
Los Angeles, CA 90071-2027
(323) 210-2900
fred.rowley@wsgr.com

*Counsel for Defendant-Appellee Pinterest, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for

Defendant-Appellee Pinterest, Inc. ("Pinterest") states that Pinterest has no parent

corporation and that no publicly traded company holds more than 10% of

Pinterest's stock.

Dated: March 6, 2023                    By: */s/ Fred A. Rowley, Jr.*
                                        Fred A. Rowley, Jr.

                                        *Counsel for Defendant-Appellee*
                                        *Pinterest, Inc.*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................ iv

INTRODUCTION AND COUNTER-STATEMENT OF THE ISSUES ............... 1

JURISDICTIONAL STATEMENT ........................................................ 6

STATEMENT OF FACTS ........................................................ 7

    I.    Pinterest's Online Platform for User-Generated Content ................... 7

    II.    The DMCA and Pinterest's Copyright-Protection Regime ............... 11

    III.    Davis's Lawsuit, His Pleading "Gamesmanship," and the Motion to Dismiss Proceedings ........................................................ 12

    IV.    The District Court's Scheduling Order, Davis's Refusal to Comply with the Deadline to Identify Alleged Infringements, and the Court's Discovery Orders ........................................................ 15

    V.    The District Court's Order Granting Pinterest Summary Judgment ........................................................ 21

SUMMARY OF ARGUMENT ........................................................ 26

STANDARD OF REVIEW ........................................................ 31

ARGUMENT ........................................................ 31

    I.    The District Court Properly Excluded Alleged Infringements that Davis Failed to Identify by the Scheduling Order Deadline, and that Violated the Court's Orders. ................................................. 31

        A.    The District Court Exercised Its Authority to Enforce Its Scheduling Order Deadline and Bar Davis From Asserting Additional, Late Infringement Allegations. ............ 31

        B.    The District Court Also Acted Within Its Discretion in Excluding New Alleged Infringements under Rule

37(c)(1) Because They Violated the Court's Prior
Discovery Orders. .................................................. 37

    1.    The District Court Had the Authority under Rule
37(c)(1) to Impose a Sanction for Davis's
Violation of Its Prior Discovery Orders. ...................... 38

    2.    The District Court Acted Within Its Discretion in
Finding Davis's Untimely Assertion of Alleged
Infringements Neither Substantially Justified Nor
Harmless. ...................................................... 41

    3.    The District Court's Sanction Was Not Claim
Dispositive. .................................................. 45

II.    The DMCA Shields Pinterest from Liability for Davis's
Copyright Infringement Claim. ......................................... 48

    A.    Under the Regime Enacted by Congress, Online Service
Providers that Meet the DMCA's Eligibility
Requirements Are Shielded from Claims of Copyright
Infringement. .......................................................... 48

    B.    Pinterest's Creation of Variants and Use of Algorithms
Facilitate User Access and Fall Within the Heartland of
§ 512(c)'s Safe Harbor. .......................................... 50

    C.    The Presence of Advertising and Use of Ad-Placement
Algorithms Do Not Remove Pinterest from § 512(c)'s
Safe Harbor. .......................................................... 55

    D.    Even if Somehow Preserved, Davis's Infringement
Theory Based on Pinterest's Notifications Is Baseless............ 59

CONCLUSION ................................................... 63

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM ................................................... ADDENDUM-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguirre v. U.S. Nuclear Regul. Comm'n*,
  11 F.4th 719 (9th Cir. 2021) .................................................................39

*In re Arizona*,
  528 F.3d 652 (9th Cir. 2008) .............................................................34

*Golant v. Levy*,
  239 F.3d 931 (7th Cir. 2001) .............................................................47

*Henry v. Gill Indus., Inc.*,
  983 F.2d 943 (9th Cir. 1993) .............................................................47

*Janicki Logging Co. v. Mateer*,
  42 F.3d 561 (9th Cir. 1994) ..........................................................31, 32

*Johnson v. Mammoth Recreations, Inc.*,
  975 F.2d 604 (9th Cir. 1992) .............................................................32

*Keenan v. Allan*,
  91 F.3d 1275 (9th Cir. 1996) .............................................................61

*Lenz v. Universal Music Corp*,
  815 F.3d 1145 (9th Cir. 2016) ...........................................................11

*Liberty Ins. Corp. v. Brodeur*,
  41 F.4th 1185 (9th Cir. 2022) .................................................31, 41, 42

*MacKay v. Pfeil*,
  827 F.2d 540 (9th Cir. 1987) .............................................................36

*Merchant v. Corizon Health, Inc.*,
  993 F.3d 733 (9th Cir. 2021) .................................................41, 45, 46

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
  605 F. Supp. 3d 1218 (N.D. Cal. 2022)...............................................57

*Opara v. Yellen*,
  57 F.4th 709 (9th Cir. 2023) .............................................................35

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ...............................................................48, 55, 61

*R & R Sails, Inc. v. Ins. Co. of Pa.*,
  673 F.3d 1240 (9th Cir. 2012) ...........................................................................45

*Silvia v. MCI Commc'ns Servs., Inc.*,
  787 F. App'x 399 (9th Cir. 2019) ......................................................................47

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013) ....................................................................*passim*

*United States v. W.R. Grace*,
  526 F.3d 499 (9th Cir. 2008) .......................................................................34, 36

*Ventura Content, Ltd. v. Motherless, Inc.*,
  885 F.3d 597 (9th Cir. 2018) ......................................................................*passim*

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ........................................................................*passim*

*Warmenhoven v. NetApp, Inc.*,
  13 F.4th 717 (9th Cir. 2021) ..........................................................................4, 36

*Weston Family P'ship v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ..............................................................................57

*Wong v. Regents of Univ. of Cal.*,
  410 F.3d 1052 (9th Cir. 2005) ...............................................................31, 37, 44

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
  259 F.3d 1101 (9th Cir. 2001) ...............................................................41, 42, 46

*Zivkovic v. S. Cal. Edison Co.*,
  302 F.3d 1080 (9th Cir. 2002) ..........................................................................31

**Statutes**

17 U.S.C. § 512 .....................................................................................*passim*

**Rules**

Fed. R. Civ. P. 16 ....................................................................31, 32, 33, 34

Fed. R. Civ. P. 26 ........................................................................38, 40, 41

Fed. R. Civ. P. 37 ..................................................................................*passim*

**Other Authorities**

S. Rep. No. 105-190 (1998) ....................................................1, 48, 59, 62

**INTRODUCTION AND COUNTER-STATEMENT OF THE ISSUES**

The lawsuit brought by Plaintiff-Appellee Harold Davis is exactly the kind of copyright action that Congress sought to avoid and, if brought, to bar under the Digital Millennium Copyright Act ("DMCA"). Pinterest is an online service that enables users to post and share images and content of interest to themselves and others. Davis is a digital photographer whose works have been posted by Pinterest's users on its website—often, but not always, with Davis's permission. Congress anticipated this situation; it understood that ever-evolving Internet platforms for displaying and sharing images and content could create a morass of copyright litigation, and that "the specter of liability [could] chill innovation" and stifle "'the variety and quality of services on the Internet.'" *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting S. Rep. No. 105-190, at 8 (1998)). Congress sought to balance the interests of service providers, users, and copyright holders by establishing safe harbors for providers like Pinterest, so long as they implemented "notice-and-takedown" procedures allowing copyright holders to redress specific instances of infringement. *Id.*

Pinterest has upheld its end of the DMCA bargain at every turn, even going beyond its statutory duties to address Davis's concerns. Three times, Davis invoked the DMCA's notice-and-takedown process, each time submitting a notice to Pinterest alleging that one photograph on Pinterest's service infringed his

copyright. It is undisputed that Pinterest acted swiftly to remove the three photographs identified in those takedown notices. Not satisfied with this statutorily prescribed remedy, Davis demanded that Pinterest do more. He wrote to Pinterest's CEO to complain that his photos were present on the service without his authorization. In response, Pinterest spent months working to address Davis's concerns, offering him a range of solutions over and above the DMCA process.

Rather than avail himself further of the DMCA's takedown remedies or the additional tools Pinterest offered, Davis brought suit. By his action, Davis seeks to stop Pinterest from undertaking just the sort of content-hosting and presentation functions that this Court has held protected by the DMCA's safe harbor: "facilitating user access to files that other users posted." *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 606 (9th Cir. 2018). Davis does not challenge these safe-harbor principles to prevent Pinterest users from posting or viewing his images on the platform; instead, as the district court explained, Davis "wants Pinterest to continue to display his images on its website and mobile application, but he does not want Pinterest to profit in any way from doing so." (1-ER-23 [SJOrder-21].)[1] The district court rightly rejected this effort "to dictate the manner

---

[1] "AOB" refers to Appellant's Opening Brief; "ER" to the Excerpts of Record; and "SER" to Pinterest's Supplemental Excerpts of Record. "SJOrder" refers to the district court's Order granting Pinterest summary judgment; "Disc.Order" refers to its October 22, 2021 discovery Order; and "Mag.Order" refers to the Magistrate Judge's July 20, 2021 Order granting Pinterest's motion to compel.

in which service providers run their platforms" as an "attempt[ed] end run around the DMCA." (*Id.*)

Davis's end-run efforts involved, as Judge Gilliam found, "patent gamesmanship" regarding his infringement allegations. (6-ER-1389 [Disc.Order-7].) Throughout the litigation, Davis refused to specifically identify the alleged infringements at issue, insisting he had no obligation to do so. At the initial case management conference, Davis argued that he need only identify "examples" of alleged infringement, but the district court rejected that position, concluding that "a deadline [for identifying alleged infringements] was necessary to ensure the efficient litigation of this case." (6-ER-1385 [Disc.Order-3].) The court ordered the parties to jointly propose a date certain by which Davis would provide a final and complete list of alleged infringements in time for Pinterest to conduct fact discovery. The parties agreed on a date, and the court entered that date in its Scheduling Order as the "Deadline for Plaintiff to Serve Final Identification of Alleged Infringements." (6-ER-1408 [Scheduling Order].)

Thereafter, Davis made not one, but "repeated attempts to sidestep the Court's deadlines." (1-ER-16 [SJOrder-14].) For while Davis challenges the district court's summary judgment decision rejecting his "*final* attempt to expand the alleged infringements in this case" (1-ER-15 [SJOrder-13] (emphasis added)), the record makes clear that the court had already issued *two orders* enforcing the

3

Scheduling Order's deadline for him to identify the universe of alleged infringements, as well as a separate obligation to confirm "every [such] instance" in response to Pinterest's discovery requests. In the first order, Magistrate Judge Hixson refused to treat the list of infringements produced by Davis as mere "examples," explaining that Judge Gilliam had already issued "an order requiring Davis to list every instance of alleged infringement." (1-SER-273-74 [Mag.Order-4-5].) Judge Hixson ordered Davis to formally serve the list as "the *final* identification of the alleged infringements," and to supplement his discovery responses accordingly. (*Id.*) In the second, Judge Gilliam affirmed that ruling, noting that it "simply held Plaintiff to [the Scheduling Order] deadline and to his discovery obligations." (6-ER-1390 [Disc.Order-8].)

The upshot is that even before the summary judgment proceedings, the district court had expressly barred Davis from asserting any instances of alleged infringement that were not disclosed in his final identification. While Davis tries "to sidestep" these orders again on appeal (*cf.* 1-ER-16 [SJOrder-14]), the orders, by themselves, amply justified the district court's decision to preclude Davis from asserting new infringement allegations at summary judgment. And Davis's failure "'in [his] opening brief to challenge an alternate ground for a district court's ruling given by the district court waives that challenge.'" *Warmenhoven v. NetApp, Inc.*, 13 F.4th 717, 729 (9th Cir. 2021) (citation omitted).

4

Of course, these prior orders highlight why the district court *also* properly exercised its Rule 37(c)(1) discretion in barring Davis from heaping on new infringement allegations at summary judgment. Despite having been repeatedly told that "the only alleged instances of infringement still in this case" were those in his final list (1-ER-13 [SJOrder-11]), Davis attempted to assert thousands of new allegations in his summary judgment papers. These included alleged infringements based on Pinterest's notifications to its users, which were nowhere referenced in Davis's final infringement list. (1-ER-17 [SJOrder-15].) Because the court had ordered Davis to produce that list as a final discovery response—as well as to comply with the Scheduling Order (1-ER-1387 [Disc.Order-5])—Davis's recalcitrance furnished a "predicate" discovery violation justifying Rule 37(c)(1) sanctions. The court hardly abused its discretion in rejecting this "eleventh hour" attempt to "radically expand the scope of this case." (1-ER-17 [SJOrder-15].)

On the merits, Davis devotes fewer than 10 pages to his DMCA challenge, and for good reason; it is both contrived and foreclosed by precedent. Davis says he "is not seeking redress for the upload and display of his copyrighted works on Pinterest by individual users." (AOB1.) Rather, he challenges only Pinterest's creation of copies, or "variants," of his works and its use of machine-learning algorithms to place them "in proximity to or in the same feed" as advertising. (AOB12.) But this Court has long recognized that the safe harbor immunizes

5

service providers for making automated copies of user-uploaded content and using algorithms to make recommendations about that content. *See UMG*, 718 F.3d at 1018; *Motherless*, 885 F.3d at 606. Such processes are protected because they are "accessibility-facilitating functions," making user-posted content more easily available to other users. *UMG*, 718 F.3d at 1018.

Shorn of rhetoric—and the factual inaccuracies that the district court identified—Davis's infringement theory rests on the bare assertion that processes facilitating access to user-uploaded content lose their safe-harbor protection if they place images "alongside advertising." (AOB11.) But this Court and others have applied the safe harbor in straightforward fashion to platforms that generated revenue "from advertising [and other promotional features] displayed along with the [user-uploaded] videos." *UMG*, 718 F.3d at 1011. This precedent makes good sense: if, as Davis posits, a service provider must choose between "commercial gain" from "advertising" (AOB1) and safe-harbor protections, the DMCA's safe harbor would effectively be limited to "electronic storage locker[s]" with minimum features. *Motherless*, 885 F.3d at 606. That would undermine Congress's objective of promoting innovation on the Internet.

This Court should affirm.

## JURISDICTIONAL STATEMENT

Pinterest agrees with Davis's jurisdictional statement.

6

## STATEMENT OF FACTS

### I. Pinterest's Online Platform for User-Generated Content

Pinterest is an online service that allows its users to upload or save content (e.g., images) of their choosing to the service and share them with other users. (1-ER-3 [SJOrder-1].) Users can create personal bulletin "boards" to display and organize content of interest to them. (*Id.*) When a user uploads an image or content to Pinterest, she is prompted to create a title and description for the post, and to provide a hyperlink to a third-party destination webpage. (1-ER-4 [SJOrder-2].) This post creates a "visual bookmark," called a "Pin," that can be viewed and searched by Pinterest users. (*Id.*)

Pinterest enables its users to explore content on its platform in several ways. When a user initially logs into her account, Pinterest displays a "home feed," an automatically-generated grid of reduced size or "thumbnail" Pins that other users have uploaded and that Pinterest's machine-learning algorithms have identified as potentially interesting to the user:

7



(1-ER-5 [SJOrder-3].)  The composition of a given home feed is personal to each user, generated based on factors such as the content she has uploaded, searches she has run, Pins she has interacted with, and boards, users, and topics that she "follows" on Pinterest.  (1-ER-4 [SJOrder-2].)

If a user clicks on a given Pin within her feed, her browser jumps to another page that includes a larger view of the Pin, as well as its title, description, and destination link.  (*Id.*)  Beneath the selected Pin, Pinterest displays a "related pins feed," another automatically-generated grid of small Pins.  (1-ER-5 [SJOrder-3].) Like the user's home feed, the related Pins feed is generated by algorithms based on the user's searches, interests, and previous activity on the service:

8



(1-ER-6 [SJOrder-4].)  Users can search for images, videos, and other content posted in Pins by using Pinterest's search functionality.  (*Id.*)  The search results are similarly displayed as a feed, or grid, of Pins, and generated based upon the user's search terms and past activity on the platform.  (*Id.*)

Pinterest enables users to edit these different feeds by selecting particular Pins as uninteresting to them.  (*Id.*)  In that manner, the user may actively shape how Pinterest's algorithms tailor future feed results.  (*Id.*)

Though Pinterest stores the original images uploaded to its service, those images are not optimized for display on the service, because users post them in a

range of formats, resolutions, and sizes. (1-ER-4 [SJOrder-2].) Thus, upon a user upload, Pinterest automatically creates multiple copies, called "variants," of the original image. (*Id.*) These variants are standardized, highly optimized images that load faster as Pins or in feeds, enhancing users' experience on the platform. (*Id.*)

Pinterest's service is free to use; it does not charge users to create accounts, to post content, or to access the content that others have posted. (1-ER-6 [SJOrder-4].) Like many online services that host user content, Pinterest generates revenue by displaying third-party advertisements across its platform and feeds. (*Id.*) Advertisers can upload their own advertising content, called "Promoted Pins," to Pinterest and pay to display Promoted Pins on a per-click or per-view basis. (1-ER-6, 29 [SJOrder-4, 27].) As with user-generated, or "organic," Pins, Pinterest uses algorithms to place Promoted Pins based on a user's prior activities and potential areas of interest. (1-ER-6 [SJOrder-4].) Promoted Pins may appear alongside organic Pins in a user's home feed (when they log in), in related Pin feeds (when a user clicks on a Pin), in search result feeds (when the user makes a query), and elsewhere in the platform. (*Id.*) Although these feeds include a combination of both organic Pins and Promoted Pins, Pinterest uses distinct algorithms to link organic and Promoted Pins to user interests, history, and activity. (1-ER-7, 25-26 [SJOrder-5, 23-24].)

10

As part of its service, Pinterest sends notifications to users by email and push notification, as well in Pinterest's mobile application. (1-ER-7 [SJOrder-5].) Notifications do not include copies of images or Pins. Rather, they include only hyperlinks to content on Pinterest that its algorithms identified as being of potential interest to the user. (*Id.*) And notifications do not include any advertisements or Promoted Pins. (*Id.*) Users can control these notifications or turn them off via their account settings. (*Id*.)

## II.  The DMCA and Pinterest's Copyright-Protection Regime

The DMCA balances the interests of copyright holders, Internet service providers, and users by conferring "safe harbor" protection on service providers who implement and follow specified "notice-and-takedown" procedures. *Lenz v. Universal Music Corp*, 815 F.3d 1145, 1151 (9th Cir. 2016). Under § 512(c), a service provider like Pinterest may "avoid copyright infringement liability for storing users' content if … [it] 'expeditiously' removes or disables access to the content after receiving notification from a copyright holder that the content is infringing." *Id.* (citing 17 U.S.C. § 512(c)).

Pinterest users have created billions of Pins on its service. (1-ER-4 [SJOrder-2].) While Pinterest cannot, and does not, manually review the content that users upload (*id.*), it has established a robust scheme for honoring takedown notices, and offers tools that go well beyond DMCA requirements. For example,

11

Pinterest offers copyright holders an online form that allows them to quickly and easily submit DMCA takedown notices.  (1-SER-197-200, 2-SER-305.)  Pinterest also enables users to click on a "Report Pin" button, available on *all* Pins, that automatically launches a pre-populated DMCA takedown notice.  (*Id.*)  Copyright holders can indicate that they would like to not only remove a specific instance of an image within a Pin, but also "Remove All" copies of that image wherever they may be found on Pinterest's platform.  (2-SER-309.)

Pinterest also helps copyright holders protect their works apart from the DMCA regime.  At its own expense, Pinterest has developed advanced management tools that allow copyright holders to control how, if at all, their works appear on Pinterest's platform.  For example, copyright holders may preventively block users from posting images from their websites onto Pinterest by embedding a "No Pin" code, supplied by Pinterest, on their sites.  (2-SER-309.)  They may also use Pinterest's Content Claiming Portal and automated-scanning technology to identify copies of their work and dictate which, if any, may remain on the platform. (2-SER-308-09.)

## III.  Davis's Lawsuit, His Pleading "Gamesmanship," and the Motion to Dismiss Proceedings

Davis is a prolific digital photographer.  (1-ER-3 [SJOrder-1].)  He has taken and uploaded thousands of photos to his own website and many other websites, where they are available to the world for free.  (1-SER-139-43.)  According to

Davis, 51 of his images were posted to Pinterest by users, some with and some without his authorization. (1-SER-158.)

Between 2015 and 2018, Davis sent Pinterest three DMCA takedown notices, each purporting to identify one of his images on the service. (1-SER-201-10, 2-SER-309-10, 314-16.) In response to each of these notices, Pinterest processed the notice and promptly removed the allegedly infringing image. (*Id.*) But Davis did not send notices for other alleged infringements he admittedly knew about; instead, he sent an email to Pinterest's then-CEO complaining generally about the presence of unauthorized copies of his images on Pinterest's service. (1-SER-279 [3/9/21Order-5].) Pinterest attempted to work with Davis, offering to go beyond its DMCA obligations by removing and automatically blocking copies of any image he identified. (*Id.*) Davis rejected this and other proposed solutions, repeatedly refusing to identify for Pinterest his works or the allegedly infringing Pins drawing his complaints. (*Id.*)

Instead, Davis filed this action on November 20, 2019, asserting copyright claims for direct and contributory infringement. (6-ER-1501 [CR1].) After two motions to dismiss focused on Davis's contributory infringement claim, the district court dismissed the claim with leave to amend, cautioning that Davis "may not add any additional defendants or new claims." (1-SER-299 [7/22/20Order-5].) Davis nonetheless filed a motion seeking leave to add a claim for removal of copyright

13

management information, and tried to assert his claims as a class action. (1-SER-292 [10/29/20Order-2].) The same day, Davis's counsel brought a separate, putative class action lawsuit against Pinterest, naming Davis as a putative class member. (*Id.*; *see also Harrington III v. Pinterest*, *Inc.*, No. 5:20-cv-05290-EJD (N.D. Cal. July 31, 2020).)

The district court held a telephonic conference and "expressed concern with Plaintiff's apparent gamesmanship: filing a new, expanded action in this district, then seeking to relate the two cases, which could circumvent the Court's prior order not to add additional defendants or causes of action." (1-SER-292 [10/29/20Order-2].) The court denied Davis's motion and directed him to file an amended complaint "address[ing] the deficiencies the Court identified in its prior order." (1-SER-294 [10/29/20Order-4].)

Davis filed his Second Amended Complaint ("SAC") on November 11, 2020, and Pinterest again moved to dismiss his claim for contributory infringement. (6-ER-1508-09 [CR56, CR62].) The district court granted the motion, reasoning that Davis failed to plead facts showing that Pinterest had knowledge of specific acts of infringement by users. (1-SER-279 [3/9/21Order-5].) Accordingly, the case proceeded only on Davis's claim for direct copyright infringement.

14

**IV.  The District Court's Scheduling Order, Davis's Refusal to Comply with the Deadline to Identify Alleged Infringements, and the Court's Discovery Orders**

The gravamen of Davis's remaining claim is that Pinterest infringed the copyrights of 51 of his works when its systems automatically copied and displayed the images that users uploaded to the service.  (6-ER-1438-88 [SAC Ex. A].)  Davis stipulated that the works-in-suit were limited to the 51 works referenced in the SAC.  (1-ER-3 [SJOrder-1].)  The claims of infringement as to those 51 works, however, were the subject of dispute between the parties during the case management and discovery process.  In particular, the parties disputed whether Davis was required to specifically identify the alleged infringements of the works he put at issue.  That dispute led the district court to issue multiple orders setting and enforcing disclosure and discovery deadlines.

*The Case Management Order and June 1 Deadline*:  On November 17, 2020, the parties filed a joint case management statement detailing their disagreement.  (6-ER-1385 [Disc.Order-3].)  Davis argued that he needed to identify only "examples" of alleged infringement because "the instances of Defendant's infringement are numerous and on-going."  (*Id.*)  Pinterest countered that allowing Davis to add allegations on a rolling basis would "disrupt the orderly conduct of the case," while requiring Davis to identify specific instances of

15

infringement would allow it to investigate and take discovery about his actual claims. (1-SER-285; *see also* 6-ER-1385 [Disc.Order-3].).

At the case management conference, the district court agreed that "a deadline [for identifying alleged infringements] was necessary to ensure the efficient litigation of this case," and ordered the parties to meet and confer about that deadline. (6-ER-1385 [Disc.Order-3].) The parties jointly proposed a case schedule setting June 1, 2021 as the deadline for Davis "to serve final identification of alleged infringements at issue" ("the June 1 Deadline"). (*Id.*) The district court adopted that deadline in its December 15, 2020 Scheduling Order. (6-ER-1408 [Scheduling Order].) Consistent with the court's framework for handling Davis's alleged infringements, the Scheduling Order fixed a discovery deadline of July 2, 2021, but explicitly provided that Pinterest "may pursue discovery regarding the identified alleged infringements through September 3, 2021." (*Id.*)

***Pinterest's Discovery Request and Davis's Response***:  In addition to the disclosure obligation established by the court's June 1 Deadline, Pinterest served discovery on Davis asking him to specifically identify the alleged infringements at issue. On December 16, 2020, Pinterest served Interrogatory No. 2:

> For each Work In Suit, identify the URL on Pinterest or other unique identifying information sufficient for Pinterest to locate each instance of alleged infringement.

(6-ER-1385 [Disc.Order-3].)  Davis responded on February 1, 2021 merely by referencing a "forthcoming production" and "reserv[ing] the right to supplement and update his response."  (*Id.*)

On February 23, 2021, Pinterest advised Davis that his "forthcoming production" response was inadequate, and that he "must provide ... a list of known infringements of Works in Suit by URL or Pin ID, or identification thereof by Bates number upon production."  (1-SER-90.)  But months passed, and Davis did not provide a responsive "production" or supplement his response to Interrogatory No. 2.

On June 1, 2021, the deadline for Davis to serve his final identification of alleged infringements, Davis produced .pdf files of what appeared to be an Excel spreadsheet, but that "were not usable" in the produced format.  (1-SER-272 [Mag.Order-3].)  Davis did not denote this spreadsheet as his final list of infringements.  Pinterest complained that the spreadsheet was inaccessible, and three days later, Davis emailed Pinterest an Excel file ("June 4 Spreadsheet") that included specific alleged infringements for 35 of the 51 works-in-suit.  (1-ER-12 [SJOrder-10]; *see also* 1-SER-211-17.)  The spreadsheet did not identify any alleged infringements for the remaining 16 works-in-suit.  (1-ER-12 [SJOrder-10].)  The spreadsheet also listed alleged infringements for hundreds of other works that were not part of the case.  (*Id.*)

17

On June 8, Pinterest asked Davis to confirm that this spreadsheet—which was not formally produced in discovery—constituted Davis's final identification of the alleged infringements of the works-in-suit and a complete response to Pinterest's Interrogatory No. 2. (6-ER-1386 [Disc.Order-4].) If so, Pinterest asked Davis to provide a cover page and verification. (*Id.*) Rather than responding directly, Davis stated that "[he] has explained in detail the nature of Pinterest's infringement and ha[s] provided *examples* of the infringement." (*Id.* (emphasis added).) Davis later reiterated that the June 4 Spreadsheet was merely "a sample of the URLs and Pin IDs." (*Id.*)

***Pinterest's Motion to Compel and the Magistrate Judge's Order***: Pinterest moved to compel, seeking an order requiring Davis to produce (1) "a bates-numbered version of the June 4 spreadsheet limited to the alleged infringements of the 51 works actually at issue"; and (2) "a verified supplemental response to Interrogatory No. 2 identifying by bates number that document as Plaintiff's final identification of alleged infringements." (*Id.*)

After holding a hearing, Magistrate Judge Hixson issued an order granting Pinterest's motion on July 20, 2021. (1-SER-270-74 [Mag.Order]; *accord* 6-ER-1386 [Disc.Order-4].) The court excused Davis's failure to meet the June 1 Deadline for providing his final identification of alleged infringements as a "minor foot fault," finding the June 4 Spreadsheet "substantially timely." (1-SER-272

18

[Mag.Order-3].)  But Judge Hixson rejected Davis's suggestion that the

spreadsheet could reflect mere "examples," finding instead that the spreadsheet

delimited the universe of alleged infringements in Davis's case:

> Judge Gilliam's scheduling order stated that June 1 was the deadline
> for Davis "to Serve Final Identification of Alleged Infringements."
> ECF No. 63.  The June spreadsheet was therefore the *final* identification
> of the alleged infringements.  To put it another way, any instances of
> infringement not listed in that spreadsheet are not part of Davis's case.
> *The undersigned will not issue an order requiring Davis to list every*
> *instance of alleged infringement because Judge Gilliam already issued*
> *that order and set a deadline that has passed.*

(1-SER-273-74 [Mag.Order-4-5] (second emphasis added).)  Judge Hixson noted

that Interrogatory No. 2 sought Davis's "legal contentions" rather than posing a

"factual question" about the instances when "one of his registered works was

reproduced or displayed on the Pinterest service":

> [Davis's] legal contentions can be whatever he wants them to be.  If he
> wants to use an expensive supercomputer to scan billions of images to
> find every last one that contains his registered works, he is free to do
> that.  If he instead just wants to use reasonable diligence to find
> instances of infringement, he can do that too.  It is up to him to build
> his own case.

(*Id.*)  The court ordered Davis to serve an amended, verified response to

Interrogatory No. 2 "that identifies the June 4 spreadsheet by Bates number" by

July 27, 2021.  (*Id.*)

Davis responded by serving a "corrected" supplemental response to

Interrogatory No. 2 that identified the June 4 Spreadsheet by Bates number, but

still maintained that it identified only "*instances* of alleged infringement of the Works in Suit."  (6-ER-1387 [Disc.Order-5] (emphasis added).)

*The District Court's October 22 Discovery Order*:  Davis sought the district court's *de novo* review of Magistrate Judge Hixson's order.  On October 22, 2021, the court affirmed the order and enforced the June 1 Deadline, deeming the order "well-reasoned and correct in all respects," "regardless of the standard of review." (6-ER-1388 [Disc.Order-6].)

*First*, the district court rejected Davis's suggestion that it was sufficient for him to identify 51 works-in-suit and leave it to Pinterest to "locate each instance of alleged infringement."  (6-ER-1389 [Disc.Order-7].)

*Second*, the court considered and rejected Davis's effort to avoid the June 1 Deadline set by the Scheduling Order.  While Davis insisted that the Scheduling Order made "no mention of a 'list'" and did not require "a summary document containing the alleged infringements," the court "decline[d] to credit such patent gamesmanship."  (*Id.*)  The court also put to rest Davis's suggestion that he "should [not] have had to provide a 'final identification of alleged infringements at issue' in this case at all," noting that the court "ordered Plaintiff to do so by June 1" in the Scheduling Order, and that "Judge Hixson simply held Plaintiff to that deadline and to his discovery obligations."  (6-ER-1390 [Disc.Order-8].)  Davis was "not free to disregard court orders," the court stressed, and "should have

sought clarification well before the June 1 deadline" if he found "any ambiguity about [his] obligation." (*Id.*)  The court thus rejected Davis's "belated request to expand the scope of the alleged infringements four months after the deadline and after the close of discovery," adding:  "*Plaintiff can eventually appeal this order if he disagrees with it*."  (6-ER-1389-90 [Disc.Order-7-8] (emphasis added).)

## V.   The District Court's Order Granting Pinterest Summary Judgment

On November 4, 2021, the parties filed cross-motions for summary judgment.  (1-ER-3 [SJOrder-1].)  The briefing focused on whether the DMCA's safe harbor applied to bar the specific instances of alleged infringement that Davis put at issue.  (1-ER-18 [SJOrder-16].)

Despite the district court's orders holding Davis to the June 1 Deadline and limiting his case to the alleged infringements in the June 4 Spreadsheet, Davis's summary judgment briefing asserted thousands of new alleged infringements, including some based on Pinterest's notification messages, none of which he had identified in his spreadsheet.  (1-ER-10 [SJOrder-8].)  Pinterest argued that the new infringements violated the June 1 Deadline and discovery deadlines and were barred by the court's prior orders.  (*Id.*)  Davis argued that holding him to the June 1 Deadline at summary judgment would amount to an improper discovery sanction under Federal Rule of Civil Procedure 37(c)(1).  (1-ER-15 [SJOrder-13]; *see also* 1-SER-8, 51.)

21

Davis sought to justify his new alleged infringements by arguing that they were "only identifiable through discovery," and that Pinterest "impeded his timely identification of these infringements." (1-ER-13 [SJOrder-11].) In support of this theory, Davis pointed to a discovery order, issued long after the June 1 Deadline had passed, compelling Pinterest to produce documents. Over a month after the June 1 Deadline, and a week after the July 2 close of fact discovery, Davis had moved to compel on 30 discovery requests, including interrogatory and document requests for "every instance" in which the 51 works-in-suit appeared on the platform. (*Id.*) Judge Hixson highlighted the lateness of the motion, opening his order with "Yikes," but ordered Pinterest to conduct a reasonable search and produce documents. (6-ER-1395, 1399 [7/20/21Order-1, 5].) Pinterest timely complied. (1-ER-13 [SJOrder-11].)

In its order granting Pinterest summary judgment based on the DMCA's safe harbor, the district court excluded the new alleged infringements. After detailing the June 1 Deadline and its prior orders, the court noted that it had already "cautioned Plaintiff in October 2021 [that] the only alleged instances of infringement still in this case are those identified in the June 4 Spreadsheet." (*Id.*) Nor could Davis blame his untimely "attempt to expand the alleged infringements" on his purported need for discovery from Pinterest, since "*Plaintiff* chose to wait so

22

long to obtain the information he needed." (1-ER-15 [SJOrder-13].) The court

explained:

> Plaintiff's need for discovery to identify the instances of alleged
> infringement was neither surprising nor incurable. Plaintiff could have
> moved to compel production of these documents. Still, Plaintiff fails
> to explain why he did not do so earlier, or request more time to provide
> the final identification of the alleged infringements. Instead, he waited
> until July 9, 2021—more than a month after the deadline—to move to
> compel. *See* Dkt. No. 98. As Judge Hixson noted in response: "Yikes."

(1-ER-14 [SJOrder-12].)

The district court rejected Davis's theory that holding him to the June 1

Deadline was an impermissible discovery "sanction" under Rule 37. (1-ER-15-16

[SJOrder-13-14].) While Davis attempted to analogize the June 1 Deadline to a

terminating sanction, the court observed that precluding "instances of alleged

infringement that he did not identify in the June 4 Spreadsheet does not amount to

the dismissal of a cause of action." (*Id.*) Under Rule 37 principles, then, the court

"need[ed] only consider whether Plaintiff's failure to timely disclose these new

infringements is substantially justified or is harmless." (*Id.*) It found that Davis's

failure was neither. The delay was not substantially justified because he made

"repeated attempts to sidestep the Court's deadline" and "ignored [the June 1,

2021] deadline at his own hazard." (*Id.*) It was not harmless because "trial was

fast approaching and it would have been infeasible to reopen discovery," leaving

"Pinterest with no ability to effectively address these new instances of

infringement." (1-ER-17 [SJOrder-15].) Davis's excuses, "if accepted, would render discovery deadlines meaningless." (*Id.*)

On the merits, the district court held that the DMCA's safe harbor barred Davis's direct-infringement claim as a matter of law. (1-ER-30 [SJOrder-28].) The court observed that Davis did not challenge users uploading his works to Pinterest, Pinterest creating variants of his works, or Pinterest's use of algorithms to help users find works and suggest related content. (1-ER-19 [SJOrder-17].) Rather, he challenged only Pinterest's creation of variants and use of algorithms to "'select and display [his] Works in the context of advertis[ing]" or to display "advertising in proximity to" his works. (1-ER-20 [SJOrder-18] (quoting Davis's briefing).) Noting that "[t]he DMCA does not permit copyright holders to dictate the manner in which service providers run their platforms," the court expressed concern that Davis's effort to control the display of his images was an "attempt[ed] … end-run around the DMCA." (1-ER-22 [SJOrder-20]) Rather than using the DMCA takedown procedures and "notify[ing] Pinterest of alleged copyright infringement," Davis "wants Pinterest to continue to display his images on its website" while preventing Pinterest from "profit[ing] in any way from doing so." (1-ER-23 [SJOrder-21].)

Davis maintained that the DMCA's safe harbor was inapplicable to Pinterest's creation of variants or use of algorithms *in connection with advertising*.

24

(1-ER-25 [SJOrder-23].)  The district court noted, however, that under this Court's precedents, online service providers "may enhance users' accessibility to uploaded content without losing protection under § 512(c)."  (1-ER-23-24 [SJOrder-21-22] (citing *UMG*, 718 F.3d at 1018).)  Pinterest's creation of variants, the court explained, "is precisely the kind of process that courts have found to occur 'by reason of the storage and at the direction of the user'" within the meaning of the DMCA.  (*Id*. (quoting 17 U.S.C. § 512).)  The court expressed skepticism over Davis's "novel theory" that using algorithms to track user activity or display advertising "is somehow copyright infringement," but concluded, at all events, that these activities were protected by the § 512(c) safe harbor.  (1-ER-25 [SJOrder-23].)

The district court noted that "Pinterest uses algorithms based on user preferences to identify and display Pins in users' feeds," thereby "facilitat[ing] users' access to Pins."  (*Id.*)  That functionality, the court reasoned, was comparable to YouTube's algorithmically-generated "related videos" feed, which had been held protected by the DMCA safe harbor.  (*Id.* (discussing *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012)).)  While Davis insisted that Pinterest used algorithms to display his images alongside advertisements, the undisputed evidence showed "the algorithms used to identify and display organic Pins [like those displaying Davis's works] are separate from the algorithms used to

25

identify and display promoted Pins." (*Id.*) This reduced Davis's infringement claim to the contention that any display of his works on Pinterest's platform—even a display intended to further access to material users had uploaded—was unprotected if in proximity to advertising. (*Id.*) The court rejected that theory, reasoning that "courts have not withheld safe harbor protection simply because service providers advertise on their platforms alongside user-uploaded content." (1-ER-27 [SJOrder-25] (collecting cases).)

## SUMMARY OF ARGUMENT

***Exclusion of Untimely Instances of Alleged Infringement***: Davis does not challenge the district court's authority or decision to adopt, as part of its Scheduling Order, the June 1 Deadline for him to identify the universe of alleged infringements. Nor does Davis dispute that he failed to timely identify the alleged infringements he later sought to assert on summary judgment, and that he seeks to revive on appeal. To the contrary, Davis frankly acknowledges that he "missed the deadline for identification of all instances of infringement." (AOB49.) Instead, Davis attempts to recast the court's exclusion of these alleged infringements solely as a discovery "sanction," imposed for the first time at summary judgment. But that feint cannot avoid the record of proceedings below, which makes clear that even before summary judgment, the district court had repeatedly excluded these new alleged infringements because they violated its Scheduling Order.

1.  Davis sought to expand the scope of alleged infringements beyond the spreadsheet he produced just after the June 1 Deadline, which he had framed as providing mere "examples" of alleged infringements.  Both Magistrate Judge Hixson and Judge Gilliam issued written orders rejecting that effort, held Davis to the Scheduling Order's June 1 Deadline, and barred him from asserting additional infringements beyond those identified in the June 4 Spreadsheet.  The district court's orders enforcing the June 1 Deadline, by themselves, amply support the exclusion of additional infringements.  Judge Gilliam told Davis, well before the summary judgment proceedings, that if he had a problem with the court's exclusion of his untimely allegations of infringement, he could "eventually appeal this order."  (6-ER-1390 [Disc.Order-8].)  But Davis did not appeal that order, Judge Hixson's underlying order, or even the Scheduling Order in his Opening Brief.  As a result, Davis has waived any such challenge.

2.  Even with respect to the Summary Judgment Order that Davis *does* challenge, his appeal is misguided.  The district court properly exercised its discretion under Rule 37, and certainly did not abuse it, in enforcing its June 1 Deadline and Davis's discovery duties by barring him from asserting new and untimely infringements at summary judgment.

On appeal, Davis argues for the first time that the district court lacked the authority to exclude the infringements as a sanction under Rule 37(c)(1) because

27

there was no "predicate" discovery violation. (AOB39.) But even if that argument is preserved, the record refutes it; the court's prior orders not only enforced its Scheduling Order, but also directed Davis to comply with Pinterest's overlapping discovery request to identify "every instance" of infringement at issue in the case. (1-ER-12 [SJOrder-10].) Because Davis flouted this discovery ruling, the court had a specific, cognizable basis to impose a Rule 37(c)(1) sanction. Nor did the court abuse its discretion in finding that Davis's delay was not substantially justified or harmless; Davis "ignored [the court's] deadline at his own hazard," and asserted his new allegations on the eve of trial, when it "would have been infeasible to reopen discovery." (1-ER-16-17 [SJOrder-14-15].)

*The District Court's Safe-Harbor Ruling*: Davis's challenge to the district court's safe-harbor ruling is equally baseless. While Davis casts his action broadly as implicating the power of service providers "to chill the efforts of individuals to enforce their copyrights" (AOB2), Davis's claim is narrow and contrived once this rhetoric is stripped away. Davis says he "is not seeking redress for the upload and display of his copyrighted works on Pinterest by individual users," but only for processes purportedly using his works "to target advertising" and "in feeds with advertisements." (AOB1.) Those processes, however, fall squarely within the heartland of the DMCA's safe harbor.

28

1.  As the district court noted, Pinterest's automatic creation of reformatted copies, or "variants," of his works "is precisely the kind of process that courts have found to occur 'by reason of the storage and at the direction of the user,'" and its use of algorithms to automatically present those images "promote[s] user access to user-uploaded content," as contemplated by § 512(c).  (1-ER-24, 26 [SJOrder-22, 24].)  Indeed, as this Court has repeatedly recognized, copying and organizing user-uploaded content are core "accessibility-facilitating functions" that service providers must undertake "[t]o carry out their function of making websites available to Internet users."  *UMG*, 718 F.3d at 1018.  This includes processes used to recommend user-uploaded content, whether they be "group[ing]," "Most Popular" lists, or "algorithms" for "suggest[ing] related videos."  *Motherless*, 885 F.3d at 607.  While Davis reprises his theory that Pinterest employs "algorithms that select and display variants derived from Mr. Davis' works in the context of advertisements" (AOB35), the district court correctly noted that this argument rests on a fundamental misunderstanding of Pinterest's processes, which undisputedly use *separate* algorithms "to identify and display organic Pins" and "promoted [or advertising] Pins in a user's feed."  (1-ER-25 [SJOrder-23].)

2.  Davis's claim reduces to the theory that safe-harbor protections are not available if a service provider displays works "alongside advertising" (AOB11) or "in proximity to or in the same feed as [advertisements]" (AOB12).  The district

29

court properly rejected this theory as well, for it flies in the teeth of both this Court's precedents construing the safe harbor and the DMCA's purpose. Countless online service platforms rely on advertising. Case after case confirms that the presence of advertising is not some illegitimate functionality that destroys the DMCA's protections. If it were, the DMCA's safe harbor would effectively be limited to "electronic storage locker[s]," a theory *Motherless* already "dispose[d] of." 885 F.3d at 606. And Congress would have had no need to narrowly carve out situations where service providers "receive[d] a financial benefit *directly*" from infringements they control. 17 U.S.C. § 512(c)(1)(B) (emphasis added). That result cannot be reconciled with the text of the statute or case law.

3. Because they were properly excluded as untimely, "instances of alleged infringement from Pinterest's notifications [to users] are not at issue in this case." (1-ER-17 [SJOrder-15].) But even if they were preserved, these allegations would not help Davis; even assuming that Pinterest's notifications displayed Davis's images—a point he did not bother to establish (*id.*)—the alleged infringement facilitates access to user-uploaded content for purposes of § 512(c), and arises "by reason of the provider referring or linking users to an online location containing infringing material" under § 512(d).

**STANDARD OF REVIEW**

To the extent Davis has not waived any challenge to the district court's orders enforcing its Scheduling Order deadline (*infra* at 35-36), they are reviewed for abuse of discretion. *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005). The court's decision to impose a Rule 37(c)(1) sanction is also reviewed for abuse of discretion. *See Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1189 (9th Cir. 2022). Its decision to grant summary judgment in favor of Pinterest is reviewed *de novo*. *Motherless*, 885 F.3d at 603.

**ARGUMENT**

I. **The District Court Properly Excluded Alleged Infringements that Davis Failed to Identify by the Scheduling Order Deadline, and that Violated the Court's Orders.**

A. **The District Court Exercised Its Authority to Enforce Its Scheduling Order Deadline and Bar Davis From Asserting Additional, Late Infringement Allegations.**

Rule 16 expressly authorizes district courts to issue and enforce scheduling orders, *see* Fed. R. Civ. P. 16(b), (f), giving them "broad discretion in supervising the pretrial phase of litigation," *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002). This Court has repeatedly cautioned that Rule 16 obligations, and scheduling orders issued under that rule, must "be taken seriously." *Janicki Logging Co. v. Mateer*, 42 F.3d 561, 566 (9th Cir. 1994). As this Court has explained:

> A scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril."  The district court's decision to honor the terms of its binding scheduling order does not simply exalt procedural technicalities over the merits of [the plaintiff's] case.  Disregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier.

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610-11 (9th Cir. 1992) (citation omitted).  Rule 16(f) recognizes the importance of these orders by authorizing trial courts to impose, on motion or *sua sponte*, any "just" sanctions where a party "fails to obey a scheduling ... order."  Fed. R. Civ. P. 16(f)(1)(C).

Here, the district court issued a Scheduling Order "SET[TING] the following deadlines pursuant to Federal Rule of Civil Procedure 16 and Civil Local Rule 16-10," including a June 1, 2021 "Deadline for Plaintiff to Serve Final Identification of Alleged Infringements."  (6-ER-1408 [Scheduling Order].)  In adopting that scheduling order, the court considered and affirmatively *rejected* Davis's suggestion that he need only identify "examples" of alleged infringement.  (6-ER-1385 [Disc.Order-3].)

The Rule 16 deadline was crystal clear and Davis should have "taken [it] seriously."  *Janicki*, 42 F.3d at 566.  Yet, in the face of the district court's directive that he needed to make a "*Final* Identification of Alleged Infringements" by June 1, 2021 (6-ER-1408 [Scheduling Order] (emphasis added)), Davis produced a spreadsheet that, he insisted, reflected only "*examples* of the infringement" (6-ER-

32

1386 [Disc.Order-4] (emphasis added)).  The parties litigated the issue twice, and Magistrate Judge Hixson and Judge Gilliam both enforced the district court's Rule 16 deadline.  In his July 20 order, Judge Hixson emphasized that "Judge Gilliam already issued that order [requiring a final identification of alleged infringement] and set a deadline that ha[d] passed."  (1-SER-274 [Mag.Order-5].)  At the hearing on the matter, Judge Hixson explained that "unless [Davis] files a motion to modify the case schedule pursuant to Rule 16(b), whatever is in the spreadsheet, those are all the alleged infringements."  (1-SER-237 [7/16/21-RT-20].)  Davis never sought relief from the June 1 Deadline under Rule 16.

Instead, he challenged the Magistrate Judge's Order before Judge Gilliam, arguing both that the Scheduling Order did not require "a summary document containing the alleged infringements," and that he should not have had "to provide a 'final identification of alleged infringements at issue' in this case *at all*."  (6-ER-1389-90 [Disc.Order-7-8] (emphasis added).)  This is precisely the same position that Davis later took on summary judgment—that he could properly assert alleged infringements beyond those identified by the June 1 Deadline—and the district court flatly rejected it in its Discovery Order.  The court noted that it had directed Plaintiff to identify all alleged infringements "by June 1," and that "Judge Hixson simply held Plaintiff to that deadline and to his discovery obligations."  (6-ER-1390 [Disc.Order-8].)

33

These enforcement orders suffice to support the district court's exclusion of additional alleged infringements after the June 1 Deadline. Davis asked to assert them, and the court barred them: "The Court rejects Plaintiff's belated request to expand the scope of the alleged infringements four months after the deadline and after the close of discovery." (6-ER-1389-90 [Disc.Order-7-8].) The driving premise of Davis's appeal is that this exclusion was a "sanction." (AOB20, 25, 39). But this Court has cautioned against treating a district court's "enforcement [of deadlines] as an exclusionary 'sanction.'" *United States v. W.R. Grace*, 526 F.3d 499, 514 (9th Cir. 2008) (en banc) (upholding orders enforcing court-imposed deadlines for identifying trial witnesses and evidence). Here, as in *W.R. Grace*, "[t]he enforcement orders were not imposed as a sanction; they simply enforce the earlier pretrial order requiring the timely identification [of alleged infringements]." *Id.*

Even if the court's enforcement orders constituted a "sanction," they are properly treated as an exercise of the court's Rule 16(f) power to sanction a violation of its Scheduling Order. Rule 16 "recognizes the inherent power of the district court to enforce its pretrial orders through sanctions, Fed. R. Civ. P. 16(f), and the discretion of the district judge to apply an appropriate level of supervision as dictated by the issues raised by each individual case." *In re Arizona*, 528 F.3d 652, 657 (9th Cir. 2008). In barring Davis from "expand[ing] the scope of the

34

alleged infringements four months after the deadline and after the close of discovery," the court stressed that he was "not free to disregard court orders" and should have "sought clarification well before the June 1 deadline." (6-ER-1389-90 [Disc.Order7-8].)

It matters not that Davis *also* violated his discovery obligations by refusing to respond fully to Pinterest's Interrogatory No. 2, and that the district court *also* "order[ed] Davis to serve an amended response to interrogatory 2 that identifies the June 4 spreadsheet by Bates number." (1-SER-274 [Mag.Order-5].) That "contention interrogatory," by which Pinterest asked Davis to "Identify each instance in which you claim we committed," was independent from the Scheduling Order's mandated "Final Identification of Alleged Infringements." (1-SER-273 [Mag.Order-4].) Davis cannot excuse his failure to comply with the Scheduling Order by highlighting that he *also* violated his discovery obligations.

Because the Scheduling Order, Magistrate Hixson's Order, and Judge Gilliam's Discovery Order sufficed to bar Davis's effort to "expand the scope of alleged infringements" (*id.*), and because Davis waived any challenge to them, this Court can and should reject his procedural challenge. It is black letter law that this Court "'may affirm on any ground supported by the record.'" *Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023) (citation omitted). The district court not only rejected Davis's effort to assert additional alleged infringements, but invited him to

"appeal this order if he disagrees with it." (6-ER-1389-90 [Disc.Order-7-8].) Yet, Davis chose not to challenge that Discovery Order—or the underlying Magistrate Judge Order and Scheduling Order—in his Opening Brief, thus leaving undisturbed a separate judicial order that expressly and independently precluded him from asserting new claims of infringement.

By failing in his "opening brief to challenge an alternate ground for a district court's ruling *given by the district court*," Davis "waives that challenge." *Warmenhoven*, 13 F.4th at 728-29 (holding that appellant's omission of a challenge in his opening brief was not a waiver because "the district court declined to address" the issue). That is especially so where the order Davis *did* challenge—the Summary Judgment Order—"relied on" the prior, unchallenged orders. *Cf. id.* at 729. Those prior orders remain valid, binding, and sufficient to affirm the judgment. *See MacKay v. Pfeil*, 827 F.2d 540, 542 n.2 (9th Cir. 1987) (reasoning that because the appellant had failed to challenge a district court's alternative ground in its opening brief, "the district court's disposition of [that issue] neither will be reviewed nor disturbed by this court").

Even if Davis *had* challenged the district court's enforcement orders, that challenge would be meritless, for there can be no question that the court acted within its discretion. *Cf. W.R. Grace*, 526 F.3d at 514. Both Magistrate Judge Hixson and Judge Gilliam found that Davis had flouted a clear and express

36

Scheduling Order deadline. Davis had been on notice of the stipulated June 1 Deadline since December 2020, but he repeatedly tried "to sidestep the Court's deadlines." (1-ER-16 [SJOrder-14].) In rejecting those efforts, the court repudiated Davis's "patent gamesmanship" and stressed that "Plaintiff's argument would render the deadline entirely meaningless." (6-ER-1389 [Disc.Order-7].) This resonates with this Court's admonition that "[p]arties must understand that they will pay a price for failure to comply strictly with scheduling and other orders, and that failure to do so may properly support severe sanctions and exclusions of evidence." *Wong*, 410 F.3d at 1060.

Davis failed to take timely action on the district court's Scheduling Order, failed to abide by that order, and now has failed even to challenge the district court's enforcement orders on appeal. As the district court noted, "Plaintiff is not free to disregard court orders." (6-ER-1390 [Disc.Order-8].) Nor is he free to circumvent the force of those orders by taking a divide-and-conquer approach on appeal, and choosing to challenge only the later, Summary Judgment Order rejecting his continued intransigence on the Court's June 1 Deadline.

**B.    The District Court Also Acted Within Its Discretion in Excluding New Alleged Infringements under Rule 37(c)(1) Because They Violated the Court's Prior Discovery Orders.**

At summary judgment, Davis sought, for the fourth time, to "expand the alleged infringements in this case," and the district court again rebuffed him,

37

finding that "[t]he June 4 Spreadsheet was—and *remains*—the final identification of alleged instances of infringement in this case."  (1-ER-17 [SJOrder-15] (emphasis added).)  Davis argues that this was an improper discovery sanction, and that the district court abused its discretion under Rule 37(c)(1) in imposing it. (AOB38-51.)  But if anything, the district court's prior orders, which *already* barred Davis from asserting new alleged infringements, gave the court stronger grounds for again excluding them—now "at the eleventh hour"—as a discovery sanction.  (1-ER-17 [SJOrder-15].)

### 1. The District Court Had the Authority under Rule 37(c)(1) to Impose a Sanction for Davis's Violation of Its Prior Discovery Orders.

Rule 37(c)(1) provides:

> **Failure to Disclose or Supplement.**  If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).  In the district court, Davis accepted this framework, arguing that his untimely assertion of new alleged infringements was substantially justified and harmless under Rule 37(c)(1), and that excluding them amounted to a terminating sanction requiring bad faith.  (1-SER-5, 8-9, 47-52.)  On appeal, Davis argues for the first time that the Rule 37(c)(1) framework is inapplicable *ab initio* because there was no predicate violation of Rule 26(a) or (e).  (AOB39-42.)

Davis's failure to raise this theory below, and his own reliance on Rule 37(c)(1), forfeits this argument, *e.g.*, *Aguirre v. U.S. Nuclear Regul. Comm'n*, 11 F.4th 719, 727 (9th Cir. 2021), and in any event it lacks merit.

As the district court recognized, Davis's attempt to "radically expand the scope of this case at the eleventh hour" constituted a violation of both its Scheduling Order *and* an overlapping discovery duty.  (1-ER-11-17 [SJOrder-9-15.)  That is no doubt why Davis himself argued under Rule 37(c)(1)'s framework below.  Pinterest specifically asked Davis, in Interrogatory No. 2, to "identify the URL on Pinterest or other unique identifying information sufficient for Pinterest to locate each instance of alleged infringement" for "each Work in Suit."  (1-ER-11 [SJOrder-9].)  Davis ignored that request for months before finally producing the June 4 Spreadsheet.  Because Davis initially refused to designate his spreadsheet as his interrogatory response, *as well as* the "Final Identification of Alleged Infringements" required by the Scheduling Order, Pinterest moved to compel. Both Magistrate Judge Hixson's and Judge Gilliam's orders on the motion reflect that the court enforced Davis's discovery obligations in addition to the Scheduling Order.  Judge Hixson found "[t]he June spreadsheet was therefore the *final* identification of the alleged infringements," and ordered Mr. Davis "to serve an amended response to interrogatory 2 that identifies the June 4 spreadsheet by Bates number."  (1-SER-274 [Mag.Order-5].)  In affirming that order, the district court

specifically noted that Judge Hixson ordered a response to this interrogatory (6-ER-1387 [Disc.Order-5]), and had "simply held Plaintiff to [the June 1 Deadline] *and his discovery obligations*" (6-ER-1390 [Disc.Order-8] (emphasis added)). In its Summary Judgment Order, the court recounted these prior proceedings and the court's prior orders refusing "to expand the scope of the alleged infringements beyond the June 4 Spreadsheet months after the deadline *and close of discovery*." (1-ER-13 [SJOrder-11] (emphasis added).)

The district court's decision, at summary judgment, to *again* exclude new alleged infringement instances thus enforced prior discovery orders (on Interrogatory No. 2) as well as its Scheduling Order (the June 1 Deadline). And because Rule 26(e)(1)(B) requires that "[a] party … who has responded to an interrogatory ... must supplement or correct its ... response ... *as ordered by the court*," Davis's failure to adhere to the court's orders on Interrogatory No. 2 provides a clear and sufficient predicate to invoke Rule 37(c)(1). While Davis insists that the "sole predicate violation" was his "noncompliance with the Court's discovery schedule" (AOB39), that reading elides the court's reasoning and the course of proceedings it relied upon. And it is ironic that Davis seizes on the Summary Judgment Order's language noting his "repeated attempts to sidestep the Court's deadlines" (AOB40 (quoting 1-ER-16)), for that delay analysis responded

40

to Davis's own arguments under Rule 37(c)(1) for why a *discovery* sanction was unjustified (1-ER-16 [SJOrder-14]).

On this score, Davis's main authority, *Liberty Insurance Corporation v. Brodeur*, 41 F.4th 1185 (9th Cir. 2022), is inapposite. (*Cf.* AOB42.) There, this Court held that the district court abused its discretion by imposing Rule 37(c)(1) sanctions for failure to disclose a witness in the plaintiffs' initial disclosures because the record showed that the plaintiffs did, in fact, disclose him. *Liberty*, 41 F.4th at 1190. But the discovery violation here did not involve Rule 26(a) disclosures; Davis violated Rule 26(e)(1)(B) by flouting the court's prior discovery *orders* directing him to serve a final response to Interrogatory No. 2. For the same reason, Davis's contention that he had no duty to supplement under Rule 26(1)(A) is beside the point. (*Cf.* AOB41, n.7.) What matters is that the court ordered him to make a final, complete response, and he persisted in flouting that order.

> ### 2. The District Court Acted Within Its Discretion in Finding Davis's Untimely Assertion of Alleged Infringements Neither Substantially Justified Nor Harmless.

This Court "give[s] particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)," *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001), and Davis offers no justification for second-guessing the district court's decision to adhere to its prior orders and undergird its exclusion with Rule 37(c)(1) authority. Under Rule 37(c)(1),

noncompliant litigants "can escape" exclusion "only if they prove that the discovery violations were substantially justified or harmless." *Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 740 (9th Cir. 2021) (quoting *Yeti*, 259 F.3d at 1106). As the district court noted (1-ER-16 [SJOrder-14]), a court weighing exclusion may consider: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or willfulness in not timely disclosing the evidence." *Liberty*, 41 F.4th at 1192 (citation omitted).

The district court had strong grounds to find that Davis's "delay is not substantially justified." (1-ER-16 [SJOrder-14].) While recognizing Davis's claim that he "needed discovery from Pinterest before he could identify all the alleged infringements at issue," the court found this need "neither surprising nor incurable," and that he had "ample time to obtain the discovery he required." (1-ER-14-16 [SJOrder-12-14].) Davis insisted that he needed information from Pinterest that he later obtained via a motion to compel, but the district court found "no explanation why, with six months' notice, he could not move to compel (if required) and meet [the June 1] deadline." (*Id.*)

The record firmly supports that finding. Davis complains that Pinterest "did not provide a timely or fulsome response" to his interrogatory seeking all copies of his works on the service. (AOB47.) But Pinterest timely objected that the

42

interrogatory was overbroad and burdensome, and Davis waited until the *last possible day*—five weeks after the June 1 Deadline—to file a discovery motion challenging "the propriety of Pinterest's objections."  (6-ER-1395 [7/20/21Order-1].)  Although the court ultimately granted the motion (in part) and ordered Pinterest to produce certain responsive information within 30 days, Magistrate Judge Hixson noted that Davis's motion came so late that the discovery could only "confirm Davis's alleged infringements" identified in the June 4 Spreadsheet.  (6-ER-1395, 1399 & n.3 [7/20/21Order-1, 5].)  Given that "*Plaintiff* chose to wait so long to obtain the information he needed for his case," the district court correctly rejected Davis's "attempts to blame Pinterest for the timing of his discovery of these new infringements."  (1-ER-15 [SJOrder-13] (emphasis added).)

Nor was Davis's failure to timely identify alleged infringements harmless.  As the district court observed, Davis "did not raise these new instances of infringement until approximately four months after the close of discovery and after briefing on dispositive motions had begun."  (1-ER-16 [SJOrder-14].)  At that point, "trial was fast approaching and it would have been infeasible to reopen discovery."  (1-ER-16-17 [SJOrder-14-15].)  That "left Pinterest with no ability to effectively address these new instances of infringement" through discovery.  (*Id.*)  This prejudice was not diminished by the fact that Davis "identified with his operative complaint the 51 copyrighted works at issue in this case."  (AOB49.)

Davis suggests that this was sufficient because Pinterest was in "sole possession" of information regarding the appearance of his works on the platform. (AOB47-49.) That is belied by the fact that Davis could, and did, possess information showing precisely where his images appeared. (1-SER-93-132.) But because Davis claimed that only certain uses of his images were infringing and did not challenge users posting his works in organic Pins, Pinterest needed to investigate the specific "instances of infringement" that Davis claimed. (1-ER-17 [SJOrder-15].)

Had the district court "permitted [Davis] to disregard the deadline" for identifying alleged infringements, "the rest of the schedule laid out by the court months in advance, and understood by the parties, would have to have been altered as well." *Cf. Wong*, 410 F.3d at 1062. As this Court has emphasized, "[d]isruption to the schedule of the court and other parties in that manner is not harmless." *Id*. Trial court efforts to manage their dockets "will be successful only if the deadlines are taken seriously by the parties, and the best way to encourage that is to enforce the deadlines." *Id.* at 1060. Indeed, the district court could properly have excluded the new claims of infringement, as it previously had, as a violation of its Scheduling Order. *Supra* at 31-37. That power was hardly vitiated by the court's additional exercise of its Rule 37(c)(1) powers.

### 3. The District Court's Sanction Was Not Claim Dispositive.

Davis reprises his argument that the district court was required to consider (1) willfulness, fault, or bad faith, and (2) the availability of lesser sanctions before excluding his new infringement allegations. (AOB43-44.) These arguments both run headlong into established Ninth Circuit law.

A district court is required to consider these factors *only when* the exclusion of evidence is so harsh that it amounts to a terminating sanction—*viz*., because it deals a "fatal blow" to a party's claim. *See Merchant*, 993 F.3d at 740-41 (quoting *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012)). As the district court explained, its exclusion of new alleged infringements did "not amount to the dismissal of a cause of action." (1-ER-16 [SJOrder-14].) The ruling left standing Davis's direct-infringement claim—the "First Cause of Action" in his SAC (6-ER-1433)—and merely limited it to the alleged infringements set out in his June 4 Spreadsheet. It was the court's merits ruling on the DMCA that was fatal to Davis's direct-copyright-infringement claim. *See infra* at 48-63.

Davis argues that the exclusion "effectively dismissed a multitude of discrete claims of copyright infringement," but none of the cases he cites involves Rule 37(c)(1) sanctions or other sanctions. (AOB43-44). Those cases address the separate-accrual rule for statutes of limitations and are inapposite. The law is clear that a "claim" for the purposes of Rule 37(c)(1) sanctions means a "cause of

45

action." *R & R Sails*, 673 F.3d at 1247 n.1 (willfulness, fault, or bad faith needed "when a Rule 37(c)(1) sanction results in [the] dismissal of a cause of action"); *see also Yeti*, 259 F.3d at 1106 (willfulness, fault, or bad faith needed "before dismissing a cause of action outright as a discovery sanction").

Even if the exclusion here somehow amounted to dismissal of Davis's direct-infringement claim, and even if the court's prior orders do not independently support exclusion, the court's sanction would still be proper. The district court was not required to consider a lesser sanction here because Davis never "'avail[ed] himself of the opportunity to seek a lesser sanction' by formally requesting one from the district court." *Merchant*, 993 F.3d at 741-42 (citation omitted) (noncompliant party "failed to trigger *R & R Sails*'s lesser-sanction requirement" where he "never moved the district court for a lesser sanction"). Rather, Davis insisted that the only proper course of action was to allow him to add new alleged infringements to the case months after the June 1 Deadline and the close of discovery. (*E.g.*, 1-SER-38.) On appeal, Davis still proposes no "lesser sanctions," arguing only that the district court should have permitted him to add "all instances of alleged infringements" it asserted at summary judgment. (AOB44, 47.) But permitting Davis to flout the June 1 Deadline without consequence would have been no sanction *at all*.

Even if a finding of willfulness, bad faith, or fault had been required, the district court's orders and the record below readily support it. The district court criticized Davis's "patent gamesmanship" (6-ER-1389 [SJOrder-7]) and his "repeated attempts to sidestep the Court's deadlines" (1-ER-16 [SJOrder-14]). At the summary judgment hearing, the court observed: "You all have been fighting the idea that I can make you identify the instances of infringement, and I've said you do[.]" (1-SER-83 [12/9/21-RT-30].) Indeed, Davis himself admits that the district court "faulted" him for his failure to meet the June 1 Deadline and his discovery obligations. (AOB51.) In this context, "'disobedient conduct not shown to be outside the control of the litigant' is all that is required to demonstrate willfulness, bad faith, or fault." *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir. 1993) (citation omitted). While the court deemed it unnecessary to make a formal finding of willfulness, bad faith, or fault (1-ER-16 [SJOrder-14]), the findings it *did* make implicitly support such a finding. *Silvia v. MCI Commc'ns Servs., Inc.*, 787 F. App'x 399, 400 (9th Cir. 2019) (district court "implicitly found" fault where the noncompliant party could have obtained the untimely disclosed information earlier); *see also Golant v. Levy*, 239 F.3d 931, 936 (7th Cir. 2001) (explaining that district court finding of willfulness, bad faith, or fault may be "implicit or explicit").

47

\* \* \*

For multiple reasons, Davis was properly limited on summary judgment to the claims of alleged infringement he had timely identified under the court's Scheduling Order and two enforcement orders.  And because Davis did not timely identify "instances of alleged infringement from Pinterest's notifications," they "are not at issue in this case."  (1-ER-17 [SJOrder-15].)

## II.   The DMCA Shields Pinterest from Liability for Davis's Copyright Infringement Claim.

### A.   Under the Regime Enacted by Congress, Online Service Providers that Meet the DMCA's Eligibility Requirements Are Shielded from Claims of Copyright Infringement.

In enacting the DMCA, Congress recognized that in "the ordinary course of their operations[,] service providers must engage in all kinds of acts that expose them to potential copyright infringement liability."  *UMG*, 718 F.3d at 1014 (quoting S. Rep. No. 105-190, at 8); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).  While noting that online services "are capable of being misused to facilitate copyright infringement," Congress sought to avoid "chill[ing] innovation" by balancing copyright holder and service provider interests."  *UMG*, 718 F.3d at 1014.  "Congress decided that 'by limiting [service providers'] liability,' it would 'ensure[] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.'"  *Id.* (quoting S. Rep. No. 105-190, at 8).  The DMCA

established safe harbors shielding service providers from copyright liability provided they take specified, responsive actions to infringement complaints (takedown notices) and activity (repeat infringers). *Id.*; *see also* 17 U.S.C. § 512(a)-(d).

The key safe harbor at issue here, § 512(c), provides that a service provider will not be liable "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1). The sole DMCA requirement challenged by Davis is whether the alleged infringements of his copyrighted images were caused or arose "by reason of the storage [of the images] at the direction of a user." *Id.* While Davis also argued below that the safe harbor was unavailable because Pinterest had "the right and ability to control" alleged infringements from which it "receive[d] a [direct] financial benefit," *id.* § 512(c)(1)(B), the district court rejected that argument (1-ER-27-30 [SJOrder-25-28]), and Davis has abandoned it on appeal.

Even the "causal relationship" issue that Davis raises (AOB4) is narrow, for he does not categorically challenge the use or presence of his works on Pinterest's platform. Rather, as the district court noted, Davis "*wants* Pinterest to continue to display his images on its website and mobile application, but [merely] does not want Pinterest to profit in any way from doing so." (1-ER-23 [SJOrder-21]

49

(emphasis added).)  Davis concedes that his claim centers on user-uploaded

content, acknowledging that his works are available on Pinterest because users

upload them to the service, that "Pinterest does not direct users to upload specific

content," and that "Pinterest does not manually review the content that users

upload."  (AOB6-7; *see also* 1-ER-4 [SJOrder-2].)  Davis argues only that the

statutory requirement that infringements arise "by reason of [their] storage at the

direction of a user," 17 U.S.C. § 512(c), requires a "causal link between the alleged

infringement and [user-directed] storage."  (AOB28.)  As Davis would have it, the

district court "remov[ed]" this "causation requirement" and expanded the

"512(c)(1) safe harbor" by applying it to processes "directed solely by Pinterest

*after*—and not *because*—a user uploaded Mr. Davis' works."  (AOB32.)  In

particular, Davis challenges Pinterest's creation of variants and use of machine-

learning algorithms to "select and display" his works "in the context of

advertisement[s]."  (AOB34-35.)  These arguments are squarely foreclosed by this

Court's precedents.

> **B.** **Pinterest's Creation of Variants and Use of Algorithms Facilitate User Access and Fall Within the Heartland of § 512(c)'s Safe Harbor.**

Davis recognizes, as he must, that safe-harbor protections apply to

Pinterest's "automated software functions that merely render the content uploaded

by a user accessible on Pinterest's platform."  (AOB30-31, 35.)  Davis asks this

Court, however, to carve out "Pinterest's creation of derivative works (*i.e.*, variants) from [his] works."  (AOB32.)

This Court has already considered and squarely rejected identical legal arguments.  In *UMG*, this Court held that § 512(c)'s safe harbor encompassed the creation of converted or "transcoded" copies of works to facilitate user access to user-uploaded content.  *See* 718 F.3d at 1015-19.  That case centered on a website that allowed users to upload and share videos with other users.  *Id.* at 1012.  When a user uploaded a video, the service provider automatically made multiple copies of the file, converting (or "transcoding") it into as many as four different formats. *Id.*  The plaintiff maintained that this process fell outside the scope of § 512(c) because the safe harbor did not shield "automatic processes undertaken to facilitate public access to user-uploaded videos."  *Id.* at 1016.  This Court rejected the argument, holding that "§ 512(c) encompasses the access-facilitating processes that automatically occur when a user uploads a video to [a service provider's website]." *Id.*  The "technological processes involved in providing web hosting services," this Court explained, "require those service providers to make, transmit and download multiple copies of users' stored materials."  *Id.* at 1018.  This Court reconfirmed this holding in *Motherless*, noting that "*UMG* disposes of the argument that altering the file format to make it accessible before posting ... takes the posting of the content out of the 'at the direction of a user' definition."  885 F.3d at 606.

51

These principles apply equally to the variants created by Pinterest.  Pinterest converts, or transcodes, uploaded files into variants of different sizes to enhance the user's experience on the platform.  (1-ER-24 [SJOrder-22].)  These variants are standardized and optimized so that images load faster when users view them across different devices and operating systems.  (*Id.*; *accord* 6-ER-1379.)[2]

For the same reasons this Court treated "the creation of chunked and Flash files" in *UMG* as an "accessibility-facilitating function[]," 718 F.3d at 1016, 1018, so too does Pinterest's variant-creation process facilitate access in a way that garners safe-harbor protection.  If courts were to deny service providers safe-harbor protection because they made and formatted copies of uploaded content, they "would eviscerate the protection afforded to service providers by § 512(c)." *YouTube*, 676 F.3d at 39.

It is equally settled that Pinterest's use of automated algorithms to select and display Pins in user feeds "facilitat[es] user access to files that other users posted." *Motherless*, 885 F.3d at 606.  This is so regardless of whether the algorithms "track

---

[2] While Davis challenges, in passing, "the making of derivative works from Mr. Davis's works to track user interaction with his works" (AOB34), there is nothing in the record to show that Pinterest makes variants to "track user interaction."  To the extent Davis means to reprise his suggestion below that Pinterest "embeds data" into images of his works, the district court properly dispatched that theory as factually baseless.  (1-ER-21-22 [SJOrder-19-20].)  Pinterest's *algorithms* glean information "'from the image itself and the user-supplied title and description'" (*id.*), and that process is plainly protected by the safe harbor (*id.*).  *See infra* at 53-55.

user interaction with his works." (AOB34.) In *Motherless*, this Court upheld the application of § 512(c) to a website allowing users to post and view pornographic video clips. 885 F.3d at 601-02. Based on titles and "tags" supplied by the users, the service provider "group[ed] together the tagged videos and pictures so that users can find what they want[ed]," and identified highly viewed files with a "Most Popular" feature. *Id.* at 605-06. The plaintiff maintained that these features vitiated safe-harbor protections because the service provider was "posting at its own direction rather than hosting material posted at the direction of the user." *Id.* at 606; *see also id.* at 605 (noting plaintiff's argument that "it was [service provider] Motherless, rather than the user, who direct[ed] the 'storage'"). This Court rejected the argument, noting that it was "inconsistent with our holding in *UMG*" and "with the meaning of the words 'at the direction of the user.'" *Id.* at 606. What mattered for safe-harbor purposes was that "users, not Motherless, decided what to post," *id.* at 608, that the files were "up on the site[] because the users put them there," *id.* at 606, and that the challenged processes "facilitat[ed] user access to files that other users posted," *id.*

There is no principled distinction between "using software" to organize and recommend uploaded content into "Most Popular" lists, as in *Motherless*, and doing so using the algorithms at issue here. Pinterest's algorithms do not "create derivative works" (*cf.* AOB35), but help Pinterest analyze a user's posts, searches,

and other activities to identify content of potential interest. They recommend content "based on multiple inputs, including Pins with which the user has interacted in the past; boards the user has created; searches the user has run; and the people, topics, and boards the user 'follows' on the website or mobile application." (1-ER-4-5 [SJOrder-2-3].) Indeed, in a case this Court discussed approvingly in both *Motherless* and *UMG*, *Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2013), the Second Circuit specifically rejected the notion that a provider loses safe-harbor protections by using algorithms to suggest uploaded content in feeds like those challenged here.

In *YouTube*, the plaintiff maintained that § 512(c)'s safe harbor was inapplicable to YouTube's "related videos" function, "by which a YouTube computer algorithm identifies and displays 'thumbnails' of clips that are 'related' to the video selected by the user." 676 F.3d at 39. The Second Circuit reasoned that the safe harbor "extends to software functions performed 'for the purpose of facilitating access to user-stored material,'" and that "exclud[ing] these automated functions from the safe harbor would eviscerate the protection afforded to service providers by § 512(c)." *Id.*

The law of this Circuit, and even its "sister circuits," are in agreement, then, on this "critical point" in applying § 512(c)'s safe harbor. *Motherless*, 885 F.3d at 607. Because Pinterest's creation of variants and use of algorithms "help[]

54

facilitate users' access to Pins," they are "precisely the kind of process[es] that courts have found to occur 'by reason of [their] storage at the direction of the user.'" (1-ER-24-25 [SJOrder-22-23].) Indeed, as the court noted, although Davis assumes that "tracking user activity through algorithms" amounts to copyright infringement, that itself is a "novel theory" for which Davis has "offer[ed] no support." (1-ER-25 [SJOrder-23].) It is far from clear how using machine-learning algorithms to select and identify images of interest to users even violates an "exclusive right granted to copyright holders." *Perfect 10*, 508 F.3d at 1159. It is, however, clear that using algorithms to recommend user-uploaded content to others is well within the § 512(c) safe harbor.

### C. The Presence of Advertising and Use of Ad-Placement Algorithms Do Not Remove Pinterest from § 512(c)'s Safe Harbor.

Davis's substantive challenge on appeal ultimately boils down to the theory that otherwise-protected processes for converting user-uploaded content and algorithmically generating user feeds lose their "causal link" to user-directed storage when deployed "in the context of advertisements" (AOB35) or "for commercial gain" (AOB1). This argument is both factually baseless and, like Davis's other arguments, contrary to settled precedent.

Davis's theory rests on the assumption that Pinterest uses "algorithms [to] select and display variants derived from Mr. Davis' works in the context of advertisements" and "to target advertisements to its users." (AOB35, 33.) But as

the district court recognized, that assumption is demonstrably wrong.  The undisputed evidence shows "that the algorithms used to identify and display organic Pins are *separate* from the algorithms used to identify and display promoted Pins in user's feed."  (1-ER-25 [SJOrder-23] (emphasis added).)  There is no dispute that user-uploaded content, like Davis's works, is displayed only in organic Pins; advertisers themselves supply the content for Promoted Pins, and Davis does not claim they ever included his works.  "The algorithms that select whether and how to display *Plaintiff's works* in Pinterest's feeds are thus still promoting user access to user-uploaded content."  (1-ER-26 [SJOrder-24].)  If Davis's work happens to be displayed next to a Promoted Pin in a user's feed, that is the coincidental result of two separate processes.

This leaves Davis with the theory that access-facilitating processes may lose their safe-harbor protections if user-uploaded posts (organic Pins) are "interspersed" with advertising (promoted Pins) (AOB 10), or displayed "in proximity to or in the same feed as promoted Pins" (AOB 12).  But the law is clear that the fact that a service provider allows or posts advertisements on its platform in proximity to user-uploaded content does not oust its service from the safe harbor.

The point is well illustrated by *Motherless*, where the Court held the safe harbor applicable to the service provider's automated accessibility processes

56

despite the service provider's reliance on paid advertising.  This Court noted that

85% of the website's income came from advertisements, 885 F.3d at 600, but did

not hesitate to hold that the safe harbor "allows service providers to perform

access-facilitating processes" like the conversion and recommending processes at

issue there, *id.* at 606—or those challenged here.  Similarly, the Court in *UMG*

specifically observed that the service provider there "generates revenue from

advertising displayed along with the videos," 718 F.3d at 1011, and had no trouble

applying the safe harbor to its "accessibility-facilitating functions," *id.* at 1018.

Davis's attempt to limit the safe harbor to services with no "commercial"

dimension is at odds with the safe harbor's text and structure in not one, but two

ways.  First, it would effectively deny safe-harbor protection to service providers

that are "anything more than an electronic storage locker," a narrow construction

that *UMG* and *Motherless* already "dispose[d] of."  *Motherless*, 885 F.3d at 606

(citing *UMG*, 718 F.3d at 1016).  Many, if not most, websites that allow users to

post and share content rely on advertising for revenue.  *E.g.*, *Weston Family P'ship

v. Twitter, Inc.*, 29 F.4th 611, 615 (9th Cir. 2022) ("Twitter does not charge its

users but rather earns money through advertising."); *Meta Platforms, Inc. v.

BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1232 (N.D. Cal. 2022) (much of

Facebook's and Instagram's "revenue is derived from selling the right to advertise

on those services").  And because service providers "routinely copy [user-

uploaded] content," organize it, and make suggestions about it, *cf. UMG*, 718 F.3d at 1018, § 512(c)'s safe harbor would be nullified if any connection between these functions and advertising ousted a provider from it.

Second, Davis's rigid distinction between commercial and non-commercial uses cannot be squared with Congress's decision to deny safe-harbor protections to service providers receiving "a financial benefit directly attributable to the infringing activity" that they have the right and ability to control. 17 U.S.C. § 512(c)(1)(B). Davis does not dispute the district court's determination that there is no "evidence linking a specific work"—much less one Pinterest knew to be infringing—"with any amount of money that Pinterest earned through advertising." (1-ER-29 [SJOrder-27].) If, despite this failure of proof, Pinterest and other service providers could be evicted from the safe harbor, and exposed to liability, because they obtained a financial benefit with only an *indirect* or even remote connection to user-directed posts, this limitation would be meaningless. That is why this Court declined to deny the service provider in *Motherless* safe-harbor protections based solely on the indirect connection between infringing posts and "more users" and "more advertising revenue." 885 F.3d at 613. The "words 'the' and 'directly' in the statute," the Court explained, "must mean that some revenue has to be distinctly attributable to the infringing material at issue." *Id.*

The safe harbor's structure and requirements were intended to promote "the variety and quality of services on the Internet" rather than to permit copyright holders to micro-manage how service providers facilitate user access on their platforms. *UMG*, 718 F.3d at 1014 (quoting S. Rep. No. 105-190, at 8). Yet, that is precisely what Davis seeks by his copyright claim here. Davis would have the court bar Pinterest from displaying his works in user-posted Pins with any tie to "commercial" gain, while otherwise allowing users to continue posting and sharing his works for "personal purposes." (AOB1.) But "[t]he DMCA does not permit copyright holders to dictate the manner in which service providers run their platforms." (1-ER-22 [SJOrder-20].) That is especially true where, as here, the service provider undisputedly has a DMCA-compliant takedown regime, and where *the copyright holder himself has successfully invoked that regime* before abandoning it in favor of a lawsuit.

### D. Even if Somehow Preserved, Davis's Infringement Theory Based on Pinterest's Notifications Is Baseless.

Davis did not timely assert any alleged infringement claims based on Pinterest's notification messages. He tried to do so on summary judgment, after the court had already limited him to the June 4 Spreadsheet in accordance with the Scheduling Order. Because the court properly excluded these untimely allegations (*supra* at 31-48), there is no need to reach the merits of Davis's challenge. But

59

even if these alleged infringements remained in the case, they would fail as a matter of law.

Any claim of copyright infringement brought by Davis based on Pinterest's notifications would fail because he offered no evidence at summary judgment that the notifications implicated any of his exclusive rights protected under Section 106 of the Copyright Act. Pinterest's notifications do not themselves contain copies of images. Instead, as Davis admits, they only "contain hyperlinks"—*i.e.*, HTML (HyperText Markup Language) *links*—to images hosted elsewhere online. (AOB37.) As the district court explained, "hyperlinking alone does not constitute copyright infringement, since it does not involve any actual copying," and thus does not itself involve the reproduction, distribution, or public display of copyrighted works. (1-ER-17 [SJOrder-15] (citation omitted).)

When a user opens an email or push notification that contains hyperlinks, their messaging program may request that the remote server hosting the linked-to images automatically supply the images to the user's computer, which in turn would display them. (1-SER-173-96.) But the notification message does not itself include copies of images. If the notification is *not* opened, or if the user's email or messaging system is *not* configured to render linked images, then no request for the images is communicated to the remote server—and no images are returned, meaning that no rights protected under the Copyright Act are even theoretically

60

implicated.  (*Id.*)  That is why "communicat[ing] HTML instructions that tell a user's browser where to find full-size images" does not constitute direct copyright infringement, but requires user engagement creating a copy.  *E.g.*, *Perfect 10*, 508 F.3d at 1162.

Davis offered no evidence at summary judgment showing a user's engagement with a notification linking to one of his works such that it rendered a Pin including Davis's image on the user's screen.  Although Davis claims that he offered evidence showing that his works "appeared" in notifications, his record cites show merely that notifications containing links to his images were sent to users.  (AOB24.)  It matters not whether, *in fact*, users might have engaged with notifications so that they "display[ed] Plaintiff's federally registered work[s]."  (*Cf.* AOB18.)  Davis bore the burden of adducing evidence that notifications displayed copies of his works, and he failed to carry that burden.  As this Court has stressed, "'[i]t is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact.  We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.'"  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted).

Even if Davis had offered evidence showing one of the works-in-suit had been displayed through a Pinterest notification message, the DMCA would bar the infringement claim.  Any rendering of Davis's image in a notification would be of

61

a user-uploaded image from a Pin, resulting from an algorithmic process that facilitates user access to that user-stored content.  (6-ER-1377-82.)  That is, the notifications serve the same "accessibility-facilitating functions" as a home feed or related Pins feed, suggesting to users content they may be interested in.  *See UMG*, 718 F.3d at 1018.  Like the grouping and Most Popular functions upheld in *Motherless* or the related videos function upheld in *YouTube*, Pinterest's notification feature "is fully automated and operates solely in response to user input without the active involvement of [Pinterest] employees," and serves to help Pinterest "users locate and gain access to material stored at the direction of other users."  *YouTube*, 676 F.3d at 40.  Any images that appear are generated "because the users put them [on Pinterest's site]."  *Motherless*, 885 F.3d at 606.

Section 512(d) of the DMCA also protects the notifications.  That section shields Pinterest from claims of infringement that arise "by reason of the provider referring or linking users to an online location containing infringing material ... by using information location tools, including ... hypertext link."  17 U.S.C. § 512(d); *see* S. Rep. No. 105-190, at 47 ("information location tools" include "a hypertext link which allows users to access material without entering its address").  As Pinterest showed below, any claim of infringement based on Pinterest's notifications would arise "by reason of" Pinterest "linking users to an online location containing [allegedly] infringing material" and would thus be barred by

§ 512(d).  Section 512(d) does not carry the "by reason of the storage" requirement found in § 512(c), but instead applies to alleged infringements arising "by reason of" linking.  Section 512(d) otherwise carries the same qualification requirements as § 512(c), which are undisputed here.  *See* 17 U.S.C. § 512(d)(1)-(3) (setting forth the same requirements as Section 512(c)(1)).

## CONCLUSION

This Court should affirm the district court's judgment.

DATED: March 6, 2023                    Respectfully submitted,


                                        _____*/s/ Fred A. Rowley, Jr.*_____
                                              Fred A. Rowley, Jr.

WILSON SONSINI GOODRICH & ROSATI        WILSON SONSINI GOODRICH & ROSATI
David H. Kramer                         633 W. Fifth Street, Suite 1550
Thomas R. Wakefield                     Los Angeles, CA 90071-2027
Andrew Kramer                           (323) 210-2900
Qifan Huang                             fred.rowley@wsgr.com
650 Page Mill Road
Palo Alto, CA 94304-1050
(650) 493-9300


*Counsel for Defendant-Appellee Pinterest, Inc.*

63

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 22-15804

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/Fred A. Rowley, Jr. | **Date** | March 6, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15804

I am the attorney or self-represented party.

**This brief contains** | 13,993 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Fred A. Rowley, Jr. | **Date** | March 6, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

# ADDENDUM OF STATUTORY AUTHORITIES

## TABLE OF CONTENTS

**Statutes**

17 U.S.C. § 512 ......................................................................... Addendum-2

**Rules**

Fed. R. Civ. P. 16 ...................................................................... Addendum-6

Fed. R. Civ. P. 37 ...................................................................... Addendum-8

## 17 U.S.C. § 512

§ 512. Limitations on liability relating to material online

[…]

(c) Information residing on systems or networks at direction of users.--

(1) In general.--A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider--

    (A)

        (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

        (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

        (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

    (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

    (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(2) Designated agent.--The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

    (A) the name, address, phone number, and electronic mail address of the agent.

(B) other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

(3) Elements of notification.--

(A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

ADDENDUM-3

(B)

(i) Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

(ii) In a case in which the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

(d) Information location tools.--A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider--

(1)

(A) does not have actual knowledge that the material or activity is infringing;

(B) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(C) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(2) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(3) upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed

to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

[…]

**Fed. R. Civ. P. 16**

Rule 16. Pretrial Conferences; Scheduling; Management

[…]

(b) Scheduling.

(1) *Scheduling Order*. Except in categories of actions exempted by local rule, the district judge—or a magistrate judge when authorized by local rule—must issue a scheduling order:

(A) after receiving the parties' report under Rule 26(f); or

(B) after consulting with the parties' attorneys and any unrepresented parties at a scheduling conference.

(2) *Time to Issue*. The judge must issue the scheduling order as soon as practicable, but unless the judge finds good cause for delay, the judge must issue it within the earlier of 90 days after any defendant has been served with the complaint or 60 days after any defendant has appeared.

(3) *Contents of the Order*.

(A) *Required Contents*. The scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions.

(B) *Permitted Contents*. The scheduling order may:

(i) modify the timing of disclosures under Rules 26(a) and 26(e)(1);

(ii) modify the extent of discovery;

(iii) provide for disclosure, discovery, or preservation of electronically stored information;

(iv) include any agreements the parties reach for asserting claims of privilege or of protection as trial preparation material after information is produced, including agreements reached under Federal Rule of Evidence 502;

(v) direct that before moving for an order relating to discovery, the movant must request a conference with the court;

(vi) set dates for pretrial conferences and for trial; and

(vii) include other appropriate matters.

(4) *Modifying a Schedule*. A schedule may be modified only for good cause and with the judge's consent.

[…]

(f) Sanctions.

(1) *In General.* On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney:

(A) fails to appear at a scheduling or other pretrial conference;

(B) is substantially unprepared to participate--or does not participate in good faith--in the conference; or

(C) fails to obey a scheduling or other pretrial order.

(2) *Imposing Fees and Costs.* Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses--including attorney's fees--incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust.

ADDENDUM-7

## Fed. R. Civ. P. 37

Rule 37. Failure to Make Disclosures or to Cooperate in Discovery; Sanctions

[…]

(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.

> (1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
>> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>>
>> (B) may inform the jury of the party's failure; and
>>
>> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

[…]